Filed 8/23/16  John G. v. Superior Court CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOHN G. et al., | D070074 |
| Petitioners, | |
| v. | (San Diego County Super. Ct. No. EJ3827A) |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al., | |
| Real Parties in Interest. | |

PROCEEDINGS for extraordinary relief after reference to a Welfare and Institutions Code section 366.26 hearing.  Kimberlee A. Lagotta, Judge.  Petition denied; stay vacated.

Dependency Legal Group of San Diego and Amanda J. Gonzales for Petitioner John G.

Dependency Legal Group of San Diego and Tracy M. DeSoto for Petitioner Hope G.

No appearance by Respondent.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Georgia A. Gebhardt, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

James J. Albert for Real Parties in Interest Michael and Colleen F.

Dependency Legal Group of San Diego and Morgan D. Ross for Real Party in Interest Jayden G., a Minor.

John G. seeks writ review of an order terminating his reunification services as to his son Jayden G. and setting a Welfare and Institutions Code[1] section 366.26 hearing. He contends the evidence was insufficient to support the court's finding that placing Jayden with him would create a substantial risk of detriment to Jayden's safety, protection, or physical or emotional well-being. We deny the petition.

FACTUAL AND PROCEDURAL BACKGROUND

In August 2014, the San Diego County Health and Human Services Agency (the Agency) filed petitions on behalf of then-three-year-old Jayden and his infant half sister H.O. under section 300 after the children were removed from the custody of their mother,

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

Hope G., and H.O.'s father, T.O.[2]  Jayden's petition alleged under section 300,
subdivision (j), (abuse or neglect of a sibling) that H.O. was discovered to have a torn
frenulum, which was determined to be a nonaccidental injury, and "non-organic failure to
thrive."  The petition further alleged that "[s]uch condition would not ordinarily be
sustained except as the result of the unreasonable or neglectful acts of the child's
mother . . . ."

H.O.'s condition was discovered by her primary care physician during a scheduled
appointment.  The physician stated in a written assessment that H.O.'s injury was
consistent with physical abuse and that "[t]o return [H.O.] to an unchanged environment
could further jeopardize [her] health and expose her to potential further injury and/or
death."  The physician reported, "During my extensive interviews with both parents, they
were not able to provide an explanation for the frenulum tear or for their daughter's lack
of weight gain."

Based on the nonaccidental injury to H.O., the Agency reported that Jayden was
also at risk of serious physical injury and neglect.  A physical examination of Jayden after
he was taken into protective custody revealed a fading bruise on his lower left
buttock/upper thigh.  When asked how he got that "owie," Jayden said he "fell down."

At the detention hearing, the court found a prima facie showing had been made on
Jayden's petition and that John was Jayden's presumed father under Family Code section
7611, subdivision (a).  The court ordered Jayden detained and placed in an approved

2      H.O. is not a subject of this writ proceeding and T.O. is not a party to the
proceeding.

3

foster home and "that services be provided as soon as possible to effectuate reunification . . . ."

The Agency's jurisdiction/disposition report stated that John and Hope were married in November 2010 and were currently separated but still legally married. John and Hope both reported that alleged father Ethan C. was Jayden's biological father, but Ethan had never been part of Jayden's life and had only visited him once.

John told the social worker he viewed Jayden as his own son even though he was not Jayden's biological father. John was present at Jayden's birth and stated that he raised Jayden with Hope until 2012 and had visited him every "six months or so." He had been trying to contact Hope and Jayden since November 2013, but Hope had blocked his phone number and he could not contact her. He never took legal action to gain custody of Jayden, but he wanted to be in Jayden's life and was willing to care for H.O. too, even though he had never met her.

The Agency acknowledged that John was a noncustodial, nonoffending parent, but did not consider him an appropriate placement option because he was residing with a woman, L.N., and her infant daughter, Serenity G., who was likely John's child. L.N. had an open child protective services case in Arizona and did not have custody of her three older children. The Agency was concerned that she was unstable based on her history and Facebook postings. She had untreated mental health issues and a history of marijuana use. John reported he was no longer in a relationship with L.N. because of "cheating issues," but they were still living together because of finances and the baby.

4

Jayden and H.O.'s foster mother reported that Jayden was a happy child, very well behaved, and a people pleaser. He made comments that indicated he had not had enough to eat when he was in Hope and T.O.'s custody, and was always very excited about eating. The foster mother let him eat healthy foods like fruit between meals. He had recently started wetting the bed "a little."

The Agency concluded placing Jayden with John would be detrimental to Jayden's safety and well-being. The Agency noted John wanted custody of Jayden, but had not had a relationship with him since 2012 and had not made reasonable efforts to gain custody of him from Hope.

In an addendum report filed on October 29, 2014, the day before the jurisdiction hearing, the Agency noted Jayden and H.O. had been detained with H.O.'s paternal grandparents the day before.[3] John reported that L.N. had moved out of his apartment and was living seven hours away with a new boyfriend. John still wanted Jayden placed with him. He told the social worker he worked five days a week from 11:00 a.m. to 8:00 p.m. and if Jayden were placed with him, he would enroll him in half-day "pre-K" and have his unemployed brother-in-law babysit Jayden after school until John came home from work. John did not have a car but his sister and brother-in-law would help him with transportation or he would use an electric wheelchair.[4]

---

[3] Because the court granted H.O.'s paternal grandparents de facto parent status as to Jayden in February 2016, we will hereafter refer to them as the de facto parents.

[4] John has cerebral palsy and uses crutches, two canes, or a wheelchair to get around.

Jayden's foster mother reported that John had called Jayden three or four times and visited once since Jayden was placed with her. Jayden would chat with John on the phone for a few minutes and then lose interest, as he did when he talked on the phone to anyone. Jayden never asked for or talked about John while he was in the foster mother's home. He referred to T.O. as his daddy and referred to John once or twice as his "second daddy." When John visited Jayden, the visit went "fine" and Jayden seemed comfortable. The foster mother framed a picture of John to put in Jayden's room where he kept other pictures, but Jayden brought the picture to the foster mother's office and said he wanted to keep it on her desk.

The foster mother observed that Jayden was very bonded to H.O. and attached to Hope. She felt it would be "detrimental and devastating" for Jayden to be moved away from his sister and not have regular contact with Hope. The Agency agreed with the foster mother's assessment, noting Jayden had not seen John for two years until John's recent visit. The Agency concluded that placing Jayden with John "out of state would be extremely detrimental to his well-being[,]" and that "Jayden would be extremely traumatized more than he has been already if he was stripped away from his family and relatives in San Diego County and placed with someone who he is not very close with and has only seen one time since age one."

At the jurisdiction hearing on October 30, 2014, the court sustained and made a true finding on Jayden's petition and set a contested disposition hearing. At a hearing on December 4, 2014, that was, in effect, the disposition hearing, John withdrew his request for trial regarding placement and submitted on the Agency's reports, and the court found

that Ethan C. was Jayden's biological father based on DNA testing. The court removed Jayden from Hope's custody and found it would be detrimental to his physical and emotional well-being to be placed with John.[5] The court ordered Jayden placed with a nonrelative extended family member, and ordered an Interstate Compact on the Placement of Children (ICPC) evaluation of John's home in Arizona. The court ordered the Agency to provide reunification services to John and Hope.

In a status review report for the six-month review hearing, the Agency reported Jayden was thriving in the de facto parents' home. John wanted Jayden placed in his home, which was undergoing an ICPC evaluation. However, the Agency had concerns about John's ongoing ability to safely care for Jayden due to his history and past questionable roommate situations. The Agency noted John had been ordered to complete parenting and individual therapy and to have supervised contact with Jayden. John had not yet enrolled in the parenting program that the social worker asked him to enroll in over a month before.

John had been having supervised phone contact with Jayden Monday through Friday, averaging four calls per week, but he had not requested in-person contact with Jayden. At first, Jayden said, "I love you Daddy," and the phone calls would last about 30 to 40 seconds. In the preceding three weeks, Jayden had not stayed on the phone for

---

5    The Agency's counsel stated, "[I]t is my understanding, in speaking with [John's] counsel, that [John] is not contesting the Court entering a detriment finding." The court responded, "All right. The Court hereby finds that it's detrimental at this point to return [Jayden] to the care and custody of [John], detrimental to [Jayden's] emotional and physical health and well-being."

more than 10 seconds and had not said, "I love you Daddy." Jayden did not ask about John or show any emotion after the calls.

Jayden's court-appointed special advocate (CASA) also filed a report for the six-month review hearing. The CASA reported Jayden and H.O. were residing in the de facto parents' home along with H.O.'s paternal aunt and her three daughters, who were between two and 12 years of age. The house was clean and well maintained and Jayden's bedroom was "a bright, happy room, filled with lots of child appropriate items." Jayden seemed to be content and enjoying the love and attention he received from his extended family, and he enjoyed his visits with Hope and T.O.

Jayden's elementary school teacher reported Jayden was doing well in school and had shown marked improvement in his fine motor skills. He engaged in behavior indicative of separation anxiety, including asking for the de facto mother when he was unhappy. During the school day he continually asked his teacher who was going to pick him up and had been doing that since he started school. He underwent a behavior screening that showed he had high anxiety, needed constant reassurance, and was experiencing depression.

Hope had been visiting Jayden three or four times per week and had been very caring toward Jayden. The caregivers and CASA observed that Jayden was very attached to Hope and loved her very much. The CASA's assessment was that Jayden's placement was physically and emotionally beneficial for him, and that his anxiety was "partly due to his fear of leaving the safe and nurturing home of his nonrelative extended family." The CASA recommended Jayden remain in his current placement.

8

At the six-month review hearing in May 2015, the court continued Jayden's placement with the de facto parents and found John had not made substantive progress with his case plan. The court ordered liberal supervised visitation for John, Hope, and the biological father.

In August 2015, the Agency filed an addendum report stating it had an approved ICPC for John to have Jayden placed in his home in Arizona. The Agency recommended Jayden have a visit with John in Arizona to assist with his transition if he were to live with John. The Agency was "well aware" of the sibling bond between Jayden and H.O. and intended to accommodate sibling visits if Jayden relocated to John's home.

The social worker who wrote the report supervised the first two visits between John and Jayden, which John initiated on his own by coming to California in July 2015. Jayden ran to hug John at the first visit. He seemed comfortable with John and did not appear to be anxious, except for initially asking when the de facto mother would return for him. John showed excellent parenting skills, and half way through the visit the social worker felt she no longer needed to supervise the visit. A different social worker supervised a third visit and reported no concerns. The social worker agreed that John was appropriate and that he assumed a "full parental role." The social worker extended the third visit because Jayden cried for John near the end of the visit and did not want the visit to end.

In the assessment/evaluation section of the report, the Agency noted the positive ICPC for placement of Jayden with John and concluded it could not find detriment in that

placement. During his supervised visits with Jayden, John showed his parenting was excellent and he could meet all of Jayden's needs.

In September 2015, the Agency filed a status review report for the 12-month review hearing. The Agency reported John was living in a home in Arizona with his sister, brother-in-law, and a teenage niece. Jayden was doing well in kindergarten and said he liked school. His anxiety and behavior of constantly asking when his grandmother was going to pick him up from school improved when his schedule was explained to him.

Although the Agency had an approved ICPC for John's home in Arizona, because of Jayden's anxiety issues the Agency arranged for Jayden to have a weeklong visit with John in September 2015 before recommending he be placed with John. The visit went well and no problems were reported. Jayden cried during Skype visits with Hope and said he missed her, and Hope called him daily. When he returned from the visit, he told Hope he really missed her while he was gone. John called Jayden daily after the visit and planned to visit Jayden in San Diego in October. The Agency wanted the San Diego visit to reinforce the relationship between John and Jayden and decrease any anxiety Jayden might be experiencing. John agreed to proceed slowly with Jayden and he wanted Hope to continue to have access to Jayden during the reunification phase.

John came to San Diego and had overnight visits with Jayden at a hotel in Ramona between October 1 and October 7, 2015. One morning John fed Jayden ravioli for breakfast and Jayden was reportedly hungry when he returned to his caregiver's home

10

that day.[6]  Jayden wet the bed nightly while he was with John and John did not wash Jayden's wet clothes.  Jayden continued to wet the bed for a few weeks after he returned to his caregivers.  During a visit with the de facto mother, Jayden told the de facto mother he missed her and had wanted to call her, but John did not allow him to call.  Jayden asked the de facto mother when he would get to come back home.

John later explained that Jayden started crying one day and told John he missed the de facto parents.  John comforted him and asked if he wanted to call them, and Jayden said, "[N]ot right now, maybe at dark time."  John did not call the de facto parents later because Jayden was fine and did not ask to call them.  Regarding the ravioli for breakfast, John explained that he ran out of money on October 4 because he had paid $120 to take a taxi from the airport to Ramona and "didn't expect the cabs to be so expensive."  He fed Jayden canned ravioli, canned fruit, and apples and had a friend from Arizona order pizza for him.  John went without food for a day to ensure there would be enough for Jayden to eat. The social worker asked John why he did not call the de facto mother "and take [Jayden] back to her home so he could stay there and get food etc."  John said he did not call because he did not want to look like a failure.

---

[6]     After addressing this incident with John in therapy, John's therapist disputed that Jayden was hungry, stating:  "There is no indication that the Case Manager or a CWS representative heard Jayden say he was not given breakfast or that he was hungry. Everyone's reaction to Jayden's breakfast appears to be fueled to a speculative comment of a foster parent asking a four year old if he is hungry or wants something to eat.  There is no mention of what Jayden ate or how much he ate after the foster parent made this self-serving speculative observation."

The social worker also asked John about Jayden's reporting that he and John had not gone to a park to play. John explained that he had no money so he told Jayden he could not afford to get a cab to go to a park and he did not know where any parks were located. John and Jayden watched movies but also took daily walks around a golf course. The social worker told John the Agency was concerned he was unable to provide enough food for Jayden, noting one of the reasons Jayden was removed from Hope was H.O.'s failure to thrive.

The CASA observed John and Jayden together on October 2, 2015, and reported that John "was very attentive to Jayden's needs and both seem to love and care for each other." Jayden's anxiety surfaced when the CASA took him to a restroom and asked him if he wanted her to come in the restroom or stay outside. Jayden replied, "Come in and close the door. I want to make sure you don't leave without me." When they saw a police car, Jayden expressed fear the police were going to take John away. John reassured Jayden the police were not going to take him away and that the police were good and helped people. Jayden told John he loved him. The CASA supported continuing visitation between John and Jayden, but did not believe it was in Jayden's best interest to move to Arizona, noting Jayden had developed a strong support system in San Diego. The CASA was encouraged by the progress Hope and T.O. had made with their reunification services.

The CASA again observed John and Jayden on October 6, 2015, when she joined them for dinner. Jayden asked to sit by the CASA and wanted the CASA to take him to the restroom. Jayden wanted to sit by John at the CASA's previous visit. Jayden seemed

12

nervous during dinner. He fidgeted a lot and could not sit still. At one point he started to cry and said he missed Hope. John calmed him down and said they would call her later. The CASA's assessment was that Jayden was just getting to know John and was in the early stages of developing a relationship with him. She believed Jayden "may be experiencing anxiety due to the changes" and that he "should be allowed more time to develop his relationship with [John] so that he feels more comfortable with him and . . . has more time to cope with the changes in his life."

In a report filed on November 24, 2015, the Agency recommended Jayden remain in the de facto parents' home. John had addressed the concerns regarding his October visit with Jayden in therapy, including running out of money and being unable to buy enough food for himself and Jayden and not being able to wash the clothes that Jayden had wet. John realized he would have to plan better financially and explained that in Arizona he had all the support he needed to provide for Jayden's physical and emotional well-being.

An Agency addendum report filed in January 2016 included a letter from Jayden's therapist stating Jayden had been receiving services since October 27, 2015, "for anxiety and fear of being left or abandoned." Jayden's treatment goals included "improving his functioning, learning appropriate emotional expression, learning coping skills, and educating the parent/guardian." The therapist reported Jayden had "made limited to moderate progress towards his goals."

Jayden visited John in Arizona from December 28, 2015, to January 4, 2016. The de facto mother reported that when she took Jayden to the airport to meet John for the

flight to Arizona, Jayden appeared to be sad. On December 29, John took Jayden to an emergency room with a temperature of 103. Jayden received breathing treatments and steroids and spent about five hours in the emergency room. John called the de facto mother the next day from a wedding he was attending with Jayden. Jayden was screaming in the background that he wanted his grandma and his mom and John could not get him to calm down. Jayden did not listen to the de facto mother because he was crying so much. John said he would call her back and later informed her that Jayden had "freaked out" when his cousin's boyfriend walked into the room.

The Agency's reported concerns regarding the visit were "that Jayden was screaming on the phone when [John] called caregiver when Jayden asked for his mom and she couldn't be reached. In addition, Jayden was afraid of a boyfriend of his cousin and he was brought to a wedding when he was still sick the day after going to the [emergency room]."

John explained to Agency social worker Regina Lowry that he took Jayden to the wedding the day after his emergency room visit because Jayden was looking forward to the wedding and said he was feeling fine, and "everybody else was going so I wanted to make sure that if something happened we would have a ride back to the hospital or an urgent care." Regarding Jayden's reaction to his cousin's boyfriend, John stated that the boyfriend "hadn't done anything." John believed the boyfriend frightened Jayden by sneaking up behind him and picking him up, but the reason Jayden gave John was that he did not "like boyfriends" and wanted his cousin all to himself. When Jayden began

14

crying uncontrollably, John took him to the car and "got the situation under control and [Jayden] was ok."

When Lowry picked Jayden and John up at the San Diego airport on January 4, 2016, she intended to observe their interaction for about an hour before returning Jayden to the de facto parents. However, Jayden immediately stated he wanted "to go home to grandma's." John said that Jayden was "probably under the weather because he has been sick." Lowry asked Jayden if he was certain he wanted to go straight to his home and he said yes. Lowry later asked Jayden why he was afraid of the cousin's boyfriend and Jayden responded, "I don't know."

Lowry's assessment was that although John "did everything he felt he could have done to keep Jayden's anxiety down and to tend to his needs[,] including taking him to the emergency room[,] . . . Jayden continues to have high anxiety when he meets new people. His therapist indicates that he has made limited to moderate progress towards his treatment goals. When I picked Jayden up after his weeklong visit with his father in Arizona, he immediately wanted to go 'home' to [the de facto mother] and refused to stay [with John] any longer so I was unable to observe [John's] interaction with him for any significant amount of time." Noting Jayden's need for continued stability in his environment, Lowry recommended Jayden remain placed with the de facto parents and reunification services continue to the 18-month date. Lowry anticipated the Agency would then recommend the court set a section 366.26 hearing.

In a status review report filed in February 2016, the Agency recommended Jayden remain placed with the de facto parents and the parents' reunification services be

15

terminated.  Lowry noted that although Jayden had been excited about going to visit John in Arizona in December 2015, when Lowry returned him from that visit to the de facto parents' home, he seemed relieved and was excited to be back there.  Jayden was comfortable and thriving in the de facto parents' home and the de facto parents were willing to keep him long term.

Lowry concluded Jayden's placement with the de facto parents "continues to be necessary and appropriate."  Because of issues that arose during Jayden's last visit with John, the Agency was "again hesitant to move forward with [placing Jayden with John]." Lowry further reported "[t]he Agency was hoping that prior to any recommendations being made for placement with John that Jayden's anxiety would decrease and that his relationship with [John] strengthen to the point where Jayden would want to live with John.  However, this has not occurred."

In February 2016, Lowry met with Jayden and asked how he would feel about living with John at John's house.  Jayden said he would be sad "because of [his cousin's] boyfriend.  Lowry asked why his cousin's boyfriend would make him sad to live with John, and Jayden replied, "I just don't like him[.]  I want to just be with [my cousin]." Lowry asked Jayden how he would feel if his cousin's boyfriend were not there and Jayden were to live with just John and his cousin at their house.  Jayden said it would be "fun" because "I have lots of toys."  Lowry asked if his cousin's boyfriend lived at John's house and Jayden said no.

Lowry asked Jayden how he would feel if he did not live with his sister H.O. Jayden said, "[S]ad, I would really miss her."  She then asked if he wanted to visit John

16

"here in San Diego[.]" Jayden looked excited and said yes. Jayden's therapist asked Jayden if he would rather live with the de facto mother or John. Jayden said he would rather live with the de facto mother because his "queen size bed at grandma's is so comfy."

John had a weekend visit with Jayden in a San Diego hotel from March 4 to March 7, 2016. Lowry observed John and Jayden for an hour and 15 minutes on the last day. Jayden appeared to be content and comfortable with John. When Jayden arrived on March 4, John took him to a grocery store and bought enough food for the weekend. They had played miniature golf by the hotel pool with the CASA, and gone to the beach and a park. Jayden spoke excitedly about going to the beach with John. Regarding Jayden's bed-wetting, John told Lowry that Jayden wore "pull-ups for bed but [the de facto mother] forgot them." Jayden had accidents but John washed his clothes and packed them clean in Jayden's suitcase. At the end of the visit, Jayden excitedly said to John, "[T]he next visit will be at your house." Lowry reported that Jayden had "a more positive visit with his father, John, but he is conflicted about living with him and states he wants to remain with his [de facto mother]."

The CASA reported that she observed John's visit with Jayden on March 6, 2016, and "the visit went smoothly." Her assessment was that Jayden was thriving in the care of the de facto parents, who provided Jayden love, stability, and structure in "a very happy, comfortable, and secure environment." The CASA believed placement with the de facto parents continued to be "outstanding for Jayden both physically and emotionally." She noted the de facto parents were willing to adopt if the parents did not

17

succeed in reunification and recommended Jayden remain placed with them. She was concerned that although John had made progress on his case plan, Jayden continued to experience anxiety and difficulty with change and placing him with John in another state could add to his anxiety. She concluded: "It is my understanding that [the Agency] will be recommending that [John's] reunification services be terminated and that a section 366.26 hearing be set to identify a permanent plan, and I am in agreement with this recommendation."

*Contested 18-month Review Hearing*

The court held the contested 18-month review hearing over two days in March 2016. The court admitted into evidence the Agency's status review report for the 12-month review hearing filed in September 2015 and all subsequent reports the Agency filed, the CASA's report filed in October 2015 and the three subsequent reports she filed, and Lowry's curriculum vitae. The court heard testimony from Lowry, T.O., the de facto mother, and John. After hearing closing argument, the court found by clear and convincing evidence that it would be detrimental to Jayden's safety, protection, and physical and emotional well-being to place him with John. The court continued Jayden's placement with the de facto parents, terminated reunification services as to all parents, and set a section 366.26 hearing. On June 30, 2016, this court issued an order staying the section 366.26 hearing.

DISCUSSION

*Sufficiency of the Evidence to Support the Court's Detriment Finding*

John contends the evidence was insufficient to support the court's finding that placing Jayden with him would create a substantial risk of detriment to Jayden's safety, protection, or physical or emotional well-being.

At the 18-month review hearing, "[t]he court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.  The social worker shall have the burden of establishing that detriment."  (§ 366.22, subd. (a).)[7]  If the court does not order the return of the child to parental custody, the court "terminates reunification services and sets a hearing for the selection and implementation of a permanent plan pursuant to section 366.26.[8]  (§ 366.22, subd. (a); [Cal. Rules of Court,] rule 5.720(c)(1) & (3).)  'Absent extraordinary circumstances, the 18-month review hearing constitutes a critical juncture at which "the court must return children to their parents and

---

7     Section 366.21, subdivision (f)(1), similarly provides that at a 12-month review hearing, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment."

8     "The juvenile court need not schedule a section 366.26 hearing if it finds by clear and convincing evidence the child is not a proper subject for adoption and there is no one willing to accept legal guardianship.  (§ 366.22, subd. (a); [Cal. Rules of Court,] rule 5.720(c)(3)(A).)"

19

thereby achieve the goal of family preservation or terminate services and proceed to devising a permanent plan for the children." ' " (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 306-307.)

"Construed with reference to section 300 and the entire system of dependency statutes [citation], the language of sections 366.21 and 366.22 does not state or imply that, in order to keep a minor out of parental custody, the serious risk of detriment posed by returning the minor to his or her parent must involve the same type of harm which formed the basis for the dependency and the removal of the minor from parental custody." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 898.) "To the contrary, the fact these statutes contain a standard—'substantial risk of detriment to the physical or emotional well-being of the minor'—which differs from the standards required by section 300 to establish juvenile court jurisdiction strongly implies the Legislature did not intend to restrict the showing of detriment at a review hearing to the type of harm which necessitated dependency intervention. [Citation.] By authorizing the continued removal of a child from parental custody based on the risk of either physical detriment or emotional detriment, sections 366.21 and 366.22 focus on the child's well-being at the time of the review hearing rather than on the initial basis for juvenile court intervention. [Citation.] Thus, while the court must consider the extent the parent has cooperated with the services provided and the efforts the parent has made to correct the problems which gave rise to the dependency (§ 366.22, subd. (a)), the decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*Id.* at p. 899.)

On appeal, we apply the substantial evidence standard of review, and view the record in the light most favorable to the court's order. (See *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426.) "In the presence of substantial evidence, [we] are without the power to reweigh conflicting evidence and alter a dependency court determination." (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705.) We give " 'full effect to the respondent's evidence, however slight, and [disregard] the appellant's evidence, however strong.' " (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.) We must uphold an order that "is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) The parent challenging the order has the burden of showing the order is not supported by substantial evidence. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) We conclude John has not met that burden.

Preliminarily, we address John's argument that the court erred by basing its detriment finding on section 361.2, subdivision (a), instead of section 366.21, subdivision (f), or section 366.22, subdivision (a). Section 361.2, subdivision (a), provides that when a court orders a child removed from the custody of a parent and a noncustodial parent requests custody of the child, "the court shall place the child with the [noncustodial] parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." A detriment finding under section 361.2 must be made by clear and convincing evidence. (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1827, 1829.) As noted, under sections 366.21, subdivision (f), and

21

366.22, subdivision (a), the court must return a child to the physical custody of a parent "unless the court finds, by a preponderance of the evidence, that the return . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."

Because the detriment finding that John challenges was made at an 18-month permanency review hearing, the court should have made its detriment finding under section 366.22, subdivision (a). However, the court's error in making the detriment finding under section 361.2 was clearly harmless because the required detriment finding was the same under either statute, and the standard of proof under the correct statute is lower than under the statute the court misapplied.[9] John has not presented any argument that the error was prejudicial.

We conclude substantial evidence supports the court's finding that placing Jayden with John would create a substantial risk of detriment to Jayden's emotional and physical well-being. The court stated: "There's no doubt in the court's mind that [John] loves Jayden. And he is, in fact, interested in placement of Jayden. But he lacks a bond with Jayden and specifically, that is because of the history since Jayden's birth.

"It's clear that Jayden was with [John] . . . from birth until about 14 months of age. And then it was at that point that Jayden was bounced around from caregiver to caregiver.

---

[9]    As noted, when the court removed Jayden from Hope's custody, the court found it would be detrimental to Jayden's physical and emotional well-being to be placed with John. The court did not specify the standard of proof by which it made that detriment finding, but John submitted on the Agency's reports and did not contest the finding. We presume the court made the detriment finding under section 361.2, subdivision (a), by clear and convincing evidence.

Jayden was with [Hope] for a short period of time, then Jayden was placed with [the maternal great-grandparents] . . . for a short period of time.

"Then, as of February 2013, [Hope] took Jayden from [John]. And from that point to present, other than the [six] visits that occurred beginning in September of 2014 to [the] present, Jayden has not had a relationship with [John]. In fact, Jayden has lived with [the de facto parents] since October of 2014. And it is [the de facto parents] who have provided a safe, stable, loving, protected and structured environment that this young boy clearly needs.

"He . . . experiences anxiety. He experiences fears of abandonment, . . . those particular fears with respect to abandonment and anxiety exhibit themselves in emotional harm to this child, as well as physical harm to this child. We see the physical harm, basically, when [Jayden] breaks down or melts down as a result of his fear of abandonment.

"The anxiety takes over, and he basically ends up in what was described, for lack of a better term, as a catatonic state at the end of some of these breakdowns that he has, as a result of his fear of being abandoned. It's clear that Jayden was improving with respect to anxiety and the bed[-]wetting for the initial phase while he was with [the de facto parents].

"But then the bed[-]wetting resumed, very clearly, at the point in time when visits with [John] resumed. And so I do find that there is a lack of bond with [John], but the clear and convincing evidence of detriment is based not just on the lack of bond, which is present as a result of the fact that [John] has been in and out of Jayden's life, but, also,

23

based upon the additional issues that Jayden presents, specifically his very strong anxiety and fear of abandonment.

"That, coupled with taking into consideration the very strong bond that he has with his sister and the relatives in the home, and his own wishes to remain with [the de facto parents], with whom he's been placed since October of 2014, persuade the court by clear and convincing evidence to find it would be detrimental to place Jayden with [John]. And that detriment is to his safety, protection, physical and emotional well-being."

The court's factual assessment of the risk of detriment to Jayden were he placed with John was reasonable and supported by substantial evidence, including the Agency's and CASA's assessments and recommendations. The following evidence supported the court's finding that Jayden was not bonded to John. Hope separated from John and left with Jayden in February 2012. John never sought custody of Jayden before requesting it in this dependency case, and he did not request in-person contact with Jayden during the first nine months of the case. Between the time John last visited Jayden at the home of Hope's grandparents in February 2013 and the 18-month review hearing in March 2016, he had six in-person visits with Jayden.

When Jayden was in his foster placement before being placed with the de facto parents, he never asked or talked about John, and when the foster mother gave him a framed picture of John to put in his room, he brought the picture to the foster mother's office and said he wanted to keep it on her desk. When John called Jayden, Jayden did not stay on the phone for more than 10 seconds and did not ask about John or show any emotion after the calls.

24

The de facto mother testified that Jayden never asks for John during the week, and never asks to call John. When John calls, Jayden typically speaks in a very monotone voice, which is different from the way he normally speaks. When Jayden talks to other people on the phone, "he has a lot of excitement in his voice." The phone calls from John are typically the same conversation lasting 10 to 15 seconds. Jayden says, "Hi, Daddy." John responds, "Hi, Buddy. What ya doing?" Jayden says, "Eating. Bye Daddy." He then hangs up. If John says, "I love you," Jayden will say, "I love you," and then they hang up. Jayden does not volunteer what he has done during the day. John has to ask, "Well, what did you do today?"—if he can get it in before Jayden hangs up. Jayden was excited to show the CASA an award he received from the Boys and Girls Club, but did not mention it to John.

When the CASA joined John and Jayden for dinner in October 2015, Jayden asked to sit by the CASA and wanted the CASA to take him to the restroom. Jayden had wanted to sit with John when the CASA previously joined them. Jayden seemed nervous, and at one point during the dinner he cried and said he missed Hope. When Lowry picked Jayden up after his visit with John in Arizona from late December 2015 to early January 2016, Jayden said he immediately wanted to go "home" to the de facto mother and refused to stay with John any longer.

The court's detriment finding was also supported by substantial evidence that Jayden suffers from abnormal anxiety and fear of abandonment, and that the prospect of being removed from the care of the de facto parents to be placed with John in Arizona was a major source of his anxiety and fear. Jayden engaged in behavior at school that

25

indicated separation anxiety, including asking for the de facto mother when he was unhappy and continually asking his teacher who was going to pick him up. He underwent a behavior screening that showed he had high anxiety and needed constant reassurance and was experiencing depression. He was undergoing therapy for anxiety and fear of abandonment and in January 2016, his therapist reported he had "made limited to moderate progress towards his [treatment] goals." The CASA believed Jayden's anxiety was "partly due to his fear of leaving the safe and nurturing home of [the de facto parents]."

The de facto mother testified that Jayden "still worries a lot. He still has anxiety. He has total meltdowns. At night before he goes to bed, every single night, he will ask, 'Who is picking me up tomorrow?' We reassure him in the morning. He will ask . . . 10 to 15 times, over and over." "He cries to where he has trouble catching his breath. . . . You can't console him. . . . He almost blocks out everybody who's speaking to him."

He had a "major meltdown" at school one day when he became anxious about the de facto mother picking him up. The de facto mother testified that his "anxiety built so bad he started to cry so bad the nurse couldn't calm him down. And the two admin ladies for the office couldn't calm him down. . . . [¶] They put the phone on speaker, and . . . he didn't even hear me telling him 'I'm on my way, Jayden. I'm not going to forget you.' " When the de facto mother arrived at the school, Jayden had cried himself to sleep and when the de facto mother "tried to wake him, he was in a major daze. . . . He just stared out, like he didn't know where he was." The de facto mother stated Jayden had "not had total meltdowns like that prior to visitation with [John]."

26

The de facto mother further testified that before visits with John, Jayden becomes extremely worried about the visits. He asks how many days it is until he sees John, how many days he has to stay with John, who will take him to the visit, and when they will pick him up. On the advice of a therapist, the de facto parents "have to make a calendar, and we have to show him what day John is coming in." Jayden asks about the visit every day and the de facto parents go over the calendar with him, showing him how many days there are on the calendar before the visit and how many days he will be with John. If they do not go over the calendar with him, his anxiety builds, he gets worried, and repeatedly asks questions. Jayden did not appear to be "overly excited or even excited about going and seeing [John]."

Shortly before the 18-month review hearing, the de facto parents took Jayden to Arizona to visit his maternal aunt and John texted and asked if they could stop by his workplace, Walmart, to visit him. They met John outside the store "and Jayden was a little standoffish." John gave Jayden an Easter basket. When Jayden asked the de facto mother to take him to the restroom, John said, "No. Hey, buddy, I'll take you." John was in his wheelchair and asked if Jayden wanted to sit on his lap. Jayden said no. John asked two more times if Jayden wanted to sit on his lap and Jayden pulled away and said no.

On the way back to their vehicle after leaving John, the de facto mother asked Jayden if he wanted to stay there and live with John in Arizona and Jayden "completely melted down." He said, "No, no. . . . I don't want to stay. I don't want you to leave me." He grabbed the de facto mother's hand and would not let go. After they put him in the

truck, he was very quiet.  When they stopped for a bathroom break 45 minutes later, Jayden had wet his pants.  The de facto mother testified that Jayden had gone a long period of time without wetting the bed, but his nightly bed-wetting resumed when he began visitation with John.

There was also substantial evidence to support the court's finding that Jayden had a "very strong bond" with his sister H.O. and the de facto parents' family, and that he wished to remain with the de facto parents.  Jayden's previous foster mother observed Jayden was very bonded to H.O. and she felt it would be "detrimental and devastating" for Jayden to be moved away from his sister.  The Agency was "well aware" of the sibling bond between Jayden and H.O. and intended to accommodate sibling visits were Jayden to relocate to John's home.  The de facto mother testified that Jayden and H.O. had a "very close brother/sister relationship."  H.O. followed Jayden around and Jayden worried about H.O.  He made sure she was with him when they went places.  When Lowry asked Jayden how he would feel if he did not live with his sister, Jayden said, "Sad, I would really miss her."  Jayden told his therapist he would rather live with the de facto mother than John and, as noted, the de facto mother testified he had a meltdown when she asked if he wanted to live with John in Arizona after their recent visit with John at Walmart.

We recognize that, generally, the lack of a bond between a parent and child alone is insufficient to support a finding at a periodic review hearing that return of the child to the parent's custody would be detrimental to the child.  (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 788.)  The issue at that point in the dependency case is

28

whether placing the child in the parent's care "represents some danger to [the child's] physical or emotional well-being." (*Ibid.*) However, the lack of a bond can obviously be an important factor to consider in determining whether placing a child with a parent creates a substantial risk to the child's emotional well-being.

Likewise, a sibling bond may be relevant to a court's detriment determination at a status review hearing. "[A]lthough a jurisdictional finding is predicated on parental conduct, a detriment finding for purposes of deciding placement with a noncustodial, nonoffending parent need not be." (*In re Luke M., supra,* 107 Cal.App.4th at p. 1425.) Because emotional harm is relevant to a detriment analysis, the court can properly consider whether a child would suffer emotional harm if separated from siblings. (*Id.* at pp. 1425-1426.)

In the present case, the court properly and reasonably considered the evidence of a lack of a bond between John and Jayden along with the evidence of Jayden's abnormal anxiety and fear of abandonment, his strong bond with his sister H.O., and his attachment to the de facto parents and their family in determining whether removing Jayden from the de facto parents' care and placing him with John in Arizona would subject him to a substantial risk of detriment. Considering the totality of these circumstances, the court reasonably found that placing Jayden with John would create a substantial risk of detriment to Jayden's emotional and physical well-being.

DISPOSITION

The petition is denied.  The stay of the section 366.26 hearing issued by this court on June 30, 2016, is vacated.


McDONALD, J.

WE CONCUR:


HALLER, Acting P. J.


O'ROURKE, J.